**HIDALGO COUNTY WATER CONTROL
AND IMPROVEMENT DISTRICT
NO. 7, et al.,**

v.

**Wyatt C. HEDRICK et al.**

No. 15407.

United States Court of Appeals
Fifth Circuit.

Sept. 30, 1955.

Rehearing Denied Nov. 1, 1955.

Neal King, Mission, Tex., Sawnie B. Smith, Edinburg, Tex., Hill, Lochridge, King & Hodson, Mission, Tex., for appellants.

Wilbur S. Cleaves, Houston, Tex., U. S. Algee, Laredo, Tex., Harbert Davenport, Brownsville, Tex., G. C. Mann, Laredo, Tex., Osce Fristoe, Harlingen, Tex., Henry H. Rankin, Jr., Edinburg, Tex., Raymond, Algee, Alvarado, Kazen & Woods, Laredo, Tex., for appellees.

John A. Pope, Jr., Rio Grande City, Tex., Rankin, Kilgore & Cherry, Edinburg, Tex., Fred J. Newland, Harlingen, Tex., Davenport & Ransome, Brownsville, Tex., for movant appellees.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

Two Water Control and Improvement Districts, political subdivisions of the State of Texas, and two individuals, filed a complaint against a Texas corporation and a number of individuals, seeking a declaratory judgment and injunction. Federal jurisdiction rests solely on 28 U.S.C.A. § 1331, which is:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."

The plaintiffs, appellants here, assert that they have certain rights to divert and use waters of the Rio Grande which inure by virtue of or are protected by the Treaty between the United States and Mexico effective November 8, 1945, and a protocol supplementary thereto, 59 Stat. 1219. This action was brought for a declaration of plaintiffs' asserted rights and to prevent the taking of waters from the Rio Grande by the defendants, who are the appellees here, in derogation of the rights of the plaintiffs.

In the complaint it is said that prior to the treaty waters of the Rio Grande were being diverted and used in the Counties of Hidalgo, Willacy and Cameron, Texas, for the irrigation of some 500,000 acres of land and for supplying water for domestic municipal and industrial purposes to a population of 250,000. Of the water so diverted and used a substantial portion had its origin in Mexico and it had begun to tap the tributaries in its territory to the lessening of the flow of the Rio Grande. Drought added to the diminution of the flow of the stream. Little of the periodic flood flows were used. Problems also existed with respect to the waters of the Colorado River. With these we are not here concerned.

In the treaty preamble the purpose was recited as being "to fix and delimit the rights of the two countries with respect to the waters * * * of the Rio Grande (Rio Bravo) from Fort Quitman, Texas, United States of America, to the Gulf of Mexico, in order to obtain the most complete and satisfactory utilization thereof * * *."

The treaty begins with definitions, the only one of which we need notice being:

" 'To divert' means the deliberate act of taking water from any channel in order to convey it elsewhere for storage, or to utilize it for domestic, agricultural, stock-raising or industrial purposes whether this be done by means of dams across the channel, partition weirs, lateral intakes, pumps or any other methods." Treaty, Art. 1(d).

The International Boundary Commission, set up under a prior treaty, was continued with new powers and duties under a name changed to the International Boundary and Water Commission. An allotment of the waters of the Rio Grande was made by the treaty between the two countries. Agreements were made for the construction of dams and for the study and planning of flood control works plants for generating electric current. Regulations were contemplated to provide for water conservation programs.

The claim of plaintiffs is based upon and solely upon the treaty and particularly upon Article 9 of the treaty which provides:

"(a) The channel of the Rio Grande (Rio Bravo) may be used by either of the two countries to convey water belonging to it.

"(b) Either of the two countries may, at any point on the main channel of the river from Fort Quitman, Texas to the Gulf of Mexico, divert and use the water belonging to it and may for this purpose construct any necessary works. However, no such diversion or use, not existing on the date this Treaty enters into force, shall be permitted in either country, nor shall works be constructed for such purpose, until the Section of the Commission in whose country the diversion or use is proposed has made a finding that the water necessary for such diversion or use is available from the share of that country, unless the Commission has agreed to a greater diversion or use as provided by paragraph (d) of this Article. The proposed use and the plans for the diversion works to be constructed in connection therewith shall be previously made known

to the Commission for its information.

"(c) Consumptive uses from the main stream and from the unmeasured tributaries below Fort Quitman shall be charged against the share of the country making them.

"(d) The Commission shall have the power to authorize either country to divert and use water not belonging entirely to such country, when the water belonging to the other country can be diverted and used without injury to the latter and can be replaced at some other point on the river.

"(e) The Commission shall have the power to authorize temporary diversion and use by one country of water belonging to the other, when the latter does not need it or is unable to use it, provided that such authorization or the use of such water shall not establish any right to continue to divert it.

"(f) In case of the occurrence of an extraordinary drought in one country with an abundant supply of water in the other country, water stored in the international storage reservoirs and belonging to the country enjoying such abundant water supply may be withdrawn, with the consent of the Commission, for the use of the country undergoing the drought.

"(g) Each country shall have the right to divert from the main channel of the river any amount of water including the water belonging to the other country, for the purpose of generating hydro-electric power, provided that such diversion causes no injury to the other country and does not interfere with the international generation of power and that the quantities not returning directly to the river are charged against the share of the country making the diversion. The feasibility of such diversions not existing on the date this Treaty enters into force shall be determined by the Commission, which shall also determine the amount of water consumed, such water to be charged against the country making the diversion.

"(h) In case either of the two countries shall construct works for diverting into the main channel of the Rio Grande (Rio Bravo) or its tributaries waters that do not at the time this Treaty enters into force contribute to the flow of the Rio Grande (Rio Bravo) such water shall belong to the country making such diversion.

"(i) Main stream channel losses shall be charged in proportion to the ownership of water being conveyed in the channel at the times and places of the losses.

"(j) The Commission shall keep a record of the waters belonging to each country and of those that may be available at a given moment, taking into account the measurement of the allotments, the regulation of the waters in storage, the consumptive uses, the withdrawals, the diversions, and the losses. For this purpose the Commission shall construct, operate and maintain on the main channel of the Rio Grande (Rio Bravo), and each Section shall construct, operate and maintain on the measured tributaries in its own country, all the gaging stations and mechanical apparatus necessary for the purpose of making computations and of obtaining the necessary data for such record. The information with respect to the diversions and consumptive uses on the unmeasured tributaries shall be furnished to the Commission by the appropriate Section. The cost of construction of any new gaging stations located on the main channel of the Rio Grande (Rio Bravo) shall be borne equally by the two Governments. The operation and maintenance of all gaging stations or the cost of such operation and maintenance shall be apportioned between the two Sections in ac-

cordance with determinations to be made by the Commission."

By a protocol between the two governments, an agreement was made specifying the jurisdiction of agencies of the respective governments as to the construction or use of the works required in the performance of the treaty. The protocol does not contain any provision that has application to the problems here presented. In the Resolution of the Senate ratifying the treaty it was stipulated:

" 'Resolved, * * * That the Senate advise and consent to the ratification of * * * a treaty between the United States of America and the United Mexican States, * * * subject to the following understandings, and that these understandings will be mentioned in the ratification of this treaty as conveying the true meaning of the treaty, and will in effect form a part of the treaty: * * *

" '(b) Insofar as they affect persons and property in the territorial limits of the United States, the powers and functions of the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, the United States Section of said Commission, and any other officer or employee of the United States, shall be subject to the statutory and constitutional controls and processes. Nothing contained in the treaty or protocol shall be construed as impairing the power of the Congress of the United States to define the terms of office of members of the United States Section of the International Boundary and Water Commission or to provide for their appointment by the President by and with the advice and consent of the Senate or otherwise.

" '(c) That nothing contained in the treaty or protocol shall be construed as authorizing the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, or the United States Section of said Commission, directly or indirectly to alter or control the distribution of water to users within the territorial limits of any of the individual States.' "

The complaint avers that except for a few periods of flood flow the waters of the Rio Grande have been inadequate to supply uses existing prior to the treaty, and notwithstanding this fact and without any allocation of water by the United States Section of the International Boundary and Water Commission the defendants have diverted and used water from the stream for irrigation purposes. These diversions and uses were begun subsequent to the treaty. The complaint says "There is not now, nor is there any present prospect for, a supply of water adequate to supply both the diversions and uses existing on November 8, 1945, [the effective date of the treaty] and the defendants' diversions and uses."

Some of the defendants filed motions to dismiss. Others filed answers. The District Court granted the motions to dismiss as to the movant defendants and dismissed the action of its own motion as to the answering defendants. The dismissal was placed upon two grounds, lack of jurisdiction over the subject matter and failure to state a claim upon which relief could be granted.

It is apparent that the original claims of the plaintiffs had their origin under appropriative rights for use on lands not adjacent to the river, while the defendants claim riparian rights based upon ownership of land adjoining the river. The primary issue arises from the assertion by the plaintiffs that they have a right, created or protected by the treaty, to continue to divert and use the waters of the Rio Grande to the same extent as was done by them at the time of the treaty date without any diminution of such waters by the defendants. The defendants counter with the position that their riparian rights were at all times paramount to the appropriative rights of the plaintiffs, that such rights were

vested property rights, that it was not intended that the treaty should create or protect any individual rights to water or the use thereof, and that if the treaty be construed to give it the effect of lessening the incidents of the riparian ownerships of defendants, the treaty provision so construed would be a deprivation of property without due process of law under the Fifth Amendment to the Constitution of the United States.

Since there is no diversity to support Federal jurisdiction, the action can be maintained only if some right, title, privilege or immunity dependent upon the treaty is set up or claimed so as to require the Court to apply, construe or pass upon the treaty in determining the right asserted. Muse v. Arlington Hotel Co., 168 U.S. 430, 18 S.Ct. 109, 42 L.Ed. 531. See also Crystal Spring Land & Water Co. v. City of Los Angeles, 177 U.S. 169, 20 S.Ct. 573, 44 L.Ed. 720; Devine v. City of Los Angeles, 202 U.S. 313, 26 S.Ct. 652, 50 L.Ed. 1046. In their complaint, after outlining the basis of the allocation of the waters of the Rio Grande between the United States and Mexico, the plaintiffs aver: "Thus the investments and activities of these plaintiffs and other American users perfected a claim to the share of the flow of the lower Rio Grande which was allotted to the United States by the treaty, which claim was cognizable in international practice and was recognized in and given effect by the treaty". In their brief the plaintiffs say that "The sole right asserted against the Appellees and the sole basis of relief sought by appellants is the protection of their water supply conferred on them by said treaty provisions." It was held at an early date that "A case * * * may truly be said to arise under the Constitution or a law of the United States, whenever its correct decision depends on the construction of either". Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 19 U.S. 264, 5 L.Ed. 257. This rule still prevails and applies to cases arising under treaties as well as under the Constitution or laws. The case before us meets the test.

Since plaintiffs insist that their asserted priority of right to divert and use waters of the Rio Grande arises from the treaty, it necessarily follows that under plaintiffs' theory the rights of defendants would be paramount in the absence of the treaty. Absent the treaty the appropriative right of plaintiffs "is in the nature of a hereditament appurtenant to the tract for the benefit of which the appropriation was made". 44 Tex. Jur. 60, Water § 44. On the other hand, no treaty intervening, the right of each of the defendants would be defined as: "The right of the owner of riparian land to use the water of the stream upon or bordering his tract is an appurtenance thereof in the nature of an incorporeal hereditament. It constitutes property within the meaning of the Constitution, and cannot be taken without his consent, save, perhaps, by condemnation and the payment of a just compensation." 44 Tex.Jur. 47, Water § 34. The observation made in an earlier case by the District Judge whose order is under review that "the Texas water laws and decisions are in hopeless confusion", is quoted in our opinion in Martinez v. Maverick County Water Control & Improvement District, 5 Cir., 1955, 219 F.2d 666.

We have no choice but to agree with the defendants that if we should adopt the plaintiffs' theory of the construction of the treaty the result would be a holding that by the treaty the plaintiffs had acquired property rights which they did not have before and that defendants had been divested of property rights which they owned prior to the treaty. To so hold would bring the treaty into collision with the Constitution. In a case involving an earlier treaty between the United States and Mexico this Court, in an opinion by Judge Waller, said:

"We should seek to avoid, if possible, a decision adjudging a treaty to be in conflict with the Constitution. It is not necessary to a decision in this case for us to pass upon the question of whether the treaty is violative of the prohibitions of the Federal Constitution, as we would

be compelled to do if the treaty required the construction contended for by Appellants." Amaya v. Stanolind Oil & Gas Co., 5 Cir., 1946, 158 F.2d 554, 557, certiorari denied 331 U.S. 808, 67 S.Ct. 1191, 91 L.Ed. 1828, rehearing denied 331 U.S. 867, 67 S.Ct. 1530, 91 L.Ed. 1871.

In the case before us, as in the Amaya case, we would avoid the question as to conflicts between treaty and Constitution. Under our view there is no such question presented.

 The rule for construction of treaties has been thus stated: "Treaties are to be construed as other contracts according to the intent of the parties." The Yulu, 5 Cir., 1934, 71 F.2d 635, 636, certiorari denied The Yulu v. United States, 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 684. Cited in the case of The Yulu is Wright v. Henkel, 190 U.S. 40, 23 S.Ct. 781, 785, 47 L.Ed. 948, where it is held that "Treaties must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose." Other like holdings might, if need be, be cited at length.

 Plaintiffs, in their brief, say that the "treaty provision is clear and needs no construction, it was intended to mean just what it says." We do not read into the treaty that which plaintiffs contend it says. The manifest purpose of the contracting parties is declared in the preamble to the treaty to be, among other things, "to fix and delimit the rights of the two countries with respect to the waters * * * of the Rio Grande". The language of the treaty relied upon by plaintiff is:

"Either of the two countries may * * * divert and use the water belonging to it * * *. However, no such diversion or use, not existing on the date this Treaty enters into force, shall be permitted in either country * * *."

The plaintiffs with plausibility insist that, as used in the treaty, "government" and "country" have different meanings and that "country" refers to the land and people. There is, we agree, a difference in the meaning of the two words. Like many another term the word "country" cannot be given a hard and fast definition applicable alike to every situation in which it is employed. Commissioner of Internal Revenue v. Chicago Portrait Co., 7 Cir., 1931, 50 F.2d 683. We cannot say that it has an identical meaning in each of the instances where it is used in the treaty under consideration. We conclude, however, that as used in the last quoted portion of the treaty it means the two nations, the United States and Mexico. The word "government", as used in the treaty, refers to the political agency through which the sovereignty of the nation is expressed and exercised.

 The treaty apportioned the water of the Rio Grande and allocated the share that might be diverted and used on each side of the river, but without making or intending to make any provision as to how or by whom the water so apportioned and allocated should be used upon being diverted. Increases in diversion to and use upon either side is prohibited except upon the conditions stated. We think it was intended by the parties to the treaty that to each nation should be left the power of making determinations, pursuant to its own law, of those who are, may become, or cease to be, entitled to the use of the waters secured by the treaty to such nation, and their relative rights among themselves. If any intent had been present to create or protect or give a priority to individual property rights of one group resulting in the diminution or divestment of those of another group, the operative language would have been couched in more explicit terms.

 The United States Supreme Court has set forth some of the generally applicable limitations on the Federal power by saying:

"The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the

rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. McCormick v. Sullivant, 10 Wheat. [192] 202 [6 L.Ed. 300]. The power of the State in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the Federal government. The title and modes of disposition of real property within the State, whether *inter vivos* or testamentary, are not matters placed under the control of Federal authority. Such control would be foreign to the purposes for which the Federal government was created, and would seriously embarrass the landed interests of the State." United States v. Fox, 94 U.S. 315, 24 L.Ed. 192.

The doctrine of the Fox case has been held applicable in cases involving treaties. Amaya v. Stanolind Oil & Gas Co., supra. We do not say, and there is no need for saying, that a treaty cannot in any event supersede the laws of a State with respect to property rights and the manner of their transfer both voluntary and by operation of law, nor do we hold that a treaty may not change the method by which such rights may be determined or enforced. We only say that the treaty in question does not purport to have any such effect as to the respective water rights of the parties to this cause. We find nothing in the protocol that has bearing on the problem submitted by this appeal.

█ Our attention is directed to the hearings before the Senate Committee and to the evidence there adduced, to Senate discussions in the Committee room and on the Senate floor, to statements of the Secretary of State, of the Attorney General of Texas and others, and to other treaties involving other nations and other rivers. There is not, as we view the case, any need for a discussion of these matters. Such factors are to be considered and weighed when and only when the meaning of a treaty provision is uncertain and the treaty language is ambiguous or admits of more than one construction. See Nielson v. Johnson, 279 U.S. 47, 49 S.Ct. 223, 73 L.Ed. 607. The language of that portion of the treaty involved in this appeal is neither uncertain, ambiguous nor susceptible of more than one construction. We find nothing in the hearings, discussions, statements or other extraneous matters that would impel us to a conclusion different than that which we have reached. But, we think, if any uncertainty did exist it would be dispelled, and if any ambiguity were present it would be removed by the ratifying resolution of the Senate which provides:

"That nothing contained in the treaty or protocol shall be construed as authorizing the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, or the United States Section of said Commission, directly or indirectly to alter or control the distribution of water to users within the territorial limits of any of the individual States."

The treaty provides for the disposition of such waters as might, after its effective date, become available for diversion and use upon the impounding of flood flows by dams and other works. These treaty provisions and the disposition of such waters as might be made available by them are not in this cause.

The Order of Dismissal entered by the District Court was proper and is affirmed.

TUTTLE, Circuit Judge.

I concur in the result.