# Relevance of Senate Ratification History to Treaty Interpretation

The most relevant extrinsic evidence of a treaty's meaning are exchanges between the parties negotiating it, *i.e.*, the President and the foreign power. The portions of the ratification record entitled to the greatest weight are representations of the Executive, who is in essence the draftsman of the treaty. The Senate's advice and consent function was designed by the Framers as a check on the President's treaty-making power, and the Senate's deliberations cannot be ignored altogether. Nonetheless, in all but the most unusual cases, the ratification record is not the determinative source of evidence as to the treaty's meaning under domestic law.

April 9, 1987

MEMORANDUM OPINION FOR THE LEGAL ADVISER,
DEPARTMENT OF STATE

## I. Introduction and Summary

This memorandum responds to your request for the views of this Office concerning the relevance of the Senate's deliberations on ratification of a treaty to subsequent interpretations of ambiguous treaty language by the Executive Branch. We use the term "deliberations" or "ratification record" to encompass sources such as hearings, committee reports, and floor debates, which are generally analogous to the "legislative history" of domestic statutes. Our focus is on the relevance of those sources to interpretation of a treaty as domestic law, *i.e.*, their relevance to the President's constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.[1] We understand that you are reviewing separately the relevance that would be ascribed under international law to the Senate's ratification record.

The question you raise does not lend itself to any clear or easy answer. As discussed below, the dual nature of treaties as international agreements and as domestic law and the concomitant division of the treaty-making power between the President and the Senate create an inevitable tension. Primarily, treaties are international obligations, negotiated by the President in his capacity as the "sole organ of the federal government in the field of international relations," *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 320

---

[1] It is indisputable that treaties are among the "supreme Law[s] of the Land," U.S. Const. art. VI, cl. 2, and that the President's constitutional duty under Article II extends to treaties as well as to statutes and the Constitution itself. *See* 1 Op. Att'y Gen. 566, 570 (1822); *In re Neagle*, 135 U.S. 1, 64 (1890).

(1936). The most relevant evidence of the meaning of a treaty lies in the mutual exchange of views between the negotiating parties — an exchange in which the Senate does not formally participate unless it explicitly conditions its consent to a treaty and that condition is communicated to and accepted by the other party. Because the advice and consent function of the Senate, however, was designed by the Framers as a constitutional check on the President's otherwise broad authority to make treaties that have the force of law, we believe that the deliberative record that is created when the Senate advises and consents to a treaty cannot be ignored in the interpretative process. Nonetheless, in all but the most unusual case, the ratification record would not be the determinative — or even the primary — source of evidence as to the treaty's meaning under domestic law.

In determining the weight to be assigned to that record, it should be observed that, conceptually, the constitutional division of treaty-making responsibility is essentially the reverse of the division of law-making authority. Congress initially agrees upon and enacts the language of domestic legislation, while the President reserves the right to determine whether that legislation will go into effect (subject, of course, to the override of any veto). Treaties, however, are proposed and negotiated by the President, subject to the approval or disapproval of the Senate. Given this conceptual framework, it is clear that the portions of the treaty ratification record that should be accorded more weight as to the treaty's meaning are the representations of the executive — the draftsman, in effect, of the treaty. Statements by individual Senators, or even groups of Senators, are certainly entitled to no more consideration — and perhaps less — than the limited weight such statements are given in the interpretation of domestic legislation when they are not confirmed by the legislation's sponsor in colloquy or otherwise.

## II. Constitutional Division of Treaty Authority

The powers of the national government were deliberately divided by the Framers among the three coordinate branches, because they considered the concentration of governmental power to be the greatest threat to individual liberty. "Basic to the constitutional structure established by the Framers was their recognition that '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny.'" *Northern Pipeline Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 57 (1982) (quoting *The Federalist* No. 47, at 300 (J. Madison) (H. Lodge ed. 1888)). Accordingly, "[t]he Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. 919, 951 (1983); *see also Buckley* v. *Valeo*, 424 U.S. 1, 122 (1976). The Supreme Court has long acknowledged that the partitions separating each branch of government from the others must be maintained

29

inviolable if liberty is to be preserved. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS* v. *Chadha*, 462 U.S. at 951.

Under this separation of powers, the President has a dual role with respect to treaties. First, the President is responsible for "making" treaties, *i.e.*, entering into negotiations with foreign governments and reaching agreement on specific provisions. U.S. Const. art. II, § 2, cl. 2. Second, as part of his responsibility to "take Care that the Laws be faithfully executed,"[2] and as the "sole organ of the federal government in the field of international relations,"[3] the President is responsible for enforcing and executing international agreements, a responsibility that necessarily "involve[s] also the obligation and authority to interpret what the treaty requires." L. Henkin, *Foreign Affairs and the Constitution* 167 (1972) (Henkin); *see also Collins* v. *Weinberger*, 707 F.2d 1518, 1522 (D.C. Cir. 1983); American Law Institute, *Restatement of the Law, Foreign Relations Law of the United States (Second)*, §§ 149, 150 (1965) (*Restatement (Second)*); *accord* American Law Institute, *Restatement of the Law, Foreign Relations Law of the United States (Revised)* (Tentative Final Draft, July 15, 1985) § 326 (*Restatement (Revised)*).[4]

The President's authority to make treaties is shared with the Senate, which must consent by a two-thirds vote.[5] This "JOINT AGENCY of the Chief Magistrate of the Union, and of two-thirds of the members of [the Senate]"[6] reflects the Framers' recognition that the negotiation and acceptance of treaties incorporates both legislative and executive responsibilities:

> [T]he particular nature of the power of making treaties indicates a peculiar propriety in that union. Though several writers on the subject of government place that power in the class of executive authorities, yet this is evidently an arbitrary disposition; for if we attend carefully to its operation it will be found to partake more of the legislative than of the executive character, though it does not seem strictly to fall within the definition of either of them. The essence of the legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of the society; while the execution of the laws and the employment of the common strength, either for this purpose or for the common defense, seem to comprise all the functions of the executive

---

[2] U.S. Const. art. II, § 3.

[3] *United States* v. *Curtiss-Wright Export Corp*, 299 U.S. at 320; *see also Haig* v. *Agee*, 453 U.S. 280, 291–292 (1981); *Chicago & Southern Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 190 (1948).

[4] The President's interpretation of a treaty is, of course, subject to review by the courts in a case or controversy that meets Article III requirements. *See* U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, . . . arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority"); *see also Kolovrat* v. *Oregon*, 366 U. S 187, 194 (1961); *Factor* v. *Laubenheimer*, 290 U.S. 276, 294 (1933); *Jones* v. *Meehan*, 175 U.S. 1, 32 (1899).

[5] "[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur. . . ." U.S. Const. art. II, § 2, cl. 2.

[6] *The Federalist* No. 66, at 406 (A. Hamilton) (C. Rossiter ed. 1961).

30

> magistrate. The power of making treaties is, plainly, neither the one nor the other . . . . The qualities elsewhere detailed as indispensable in the management of foreign negotiations point out the executive as the most fit agent in those transactions; while the vast importance of the trust and the operation of treaties as laws plead strongly for the participation of the whole or a portion of the legislative body in the office of making them.

*The Federalist* No. 75, at 450–51 (A. Hamilton) (C. Rossiter ed. 1961); *see also The Federalist* No. 64, at 390–93 (J. Jay); *The Federalist* No. 66, at 402–03 (A. Hamilton); *see generally* Congressional Research Service, *Treaties and Other International Agreements: The Role of the United States Senate*, 98th Cong., 2d Sess. 25–28 (Comm. Print prepared for the Senate Comm. on Foreign Relations, 1984) (CRS Study). Rather than vest either Congress or the President with the sole power to make treaties, the Framers sought to combine the judgment of both, providing that the President shall make the treaties, but subject to the "advice and consent" of the Senate. Thus, the Framers included the Senate in the treaty-making process because the result of that process, just as the result of the legislative process, is essentially a law that has "the effect of altering the legal rights, duties and relations of persons . . . outside the Legislative Branch." *INS* v. *Chadha*, 462 U.S. at 952. As discussed above, however, conceptually the constitutional division of treaty-making responsibility between the Senate and the President is essentially the reverse of the division of law-making authority, with the President being the draftsman of the treaty and the Senate holding the authority to grant or deny approval.

### III. Senate Practice

In practice, the Senate's formal participation in the treaty-making process begins after negotiation of the treaty.[7] At that time, the President transmits the treaty to the Senate, with a detailed description and analysis of the treaty, and any protocols, annexes, or other documents that the President considers to be integral parts of the proposed treaty. *See* CRS Study at 105. Under the Senate's rules, treaties are referred to the Senate Foreign Relations Committee,[8] which

---

[7] President Washington attempted to consult with the Senate, with limited success, on the negotiation of several treaties with the Indians. By 1816 the practice had become firmly established that the Senate would grant its "advice and consent" to treaties already negotiated by the President or his representatives. *See* Henkin at 131–132; CRS Study at 34–36.

[8] Although jurisdiction to review treaties is vested solely in the Foreign Relations Committee, Rule 25, Standing Rules of the Senate, S. Doc. No. 99–13, 99th Cong., 1st Sess. (1985), upon occasion other committees have asserted an interest in the subject matter of the treaty, even though they have no jurisdiction to make formal recommendations. For example, the Senate Armed Services Committee has held extensive hearings on the "military implications" of various treaties, including the ABM and SALT II treaties. *See Hearings on the Military Implications of the Treaty on the Limitations of Anti-Ballistic Missile Systems and the Interim Agreement on Limitation of Strategic Offensive Arms before the Senate Comm. on Armed Services*, 92d Cong., 2d Sess. (1972); *Hearings on the Military Implications of the Treaty on the Limitation of Strategic Offensive Arms and Protocol Thereto before the Senate Comm. on Armed Services*, 96th Cong., 1st Sess. (1979); *see generally* CRS Study at 106–07.

31

may hold hearings to develop a record explaining the purposes, provisions, and significance of the agreement. Typically, the principal witnesses at such hearings are representatives of the Executive Branch. The Foreign Relations Committee then issues a report to the full Senate, with its recommendation on approval of the treaty.

The Senate's practice has been to approve, to disapprove, or to approve with conditions, treaties negotiated by the Executive Branch. Express conditions imposed by the Senate may include "understandings," which interpret or clarify the obligations undertaken by the parties to the treaty but do not change those obligations,[9] or "reservations" and "amendments," which condition the Senate's consent on amendment or limitation of the substantive obligations of the parties under the agreement.[10] On occasion, the Senate has accompanied its consent by "declarations," which state the Senate's position, opinion, or intention on issues raised by the treaty, although not on the provisions of the specific treaty itself.[11] *See* CRS Study at 110.

## IV. Relevance of the Senate Ratification Record

### A. *Express Conditions*

When the Senate includes express conditions as part of its resolution of consent to ratification, the President may, if he objects, either refuse to ratify the treaty or resubmit it to the Senate with the hope that it will be approved unconditionally the second time. *See* 14 M. Whiteman, *Digest of International Law*, 138 (1970). If the President proceeds with ratification, however, such understandings or other conditions expressly imposed by the Senate are generally included by the President with the treaty documents deposited for ratification or communicated to the other parties at the same time the treaty is deposited for ratification.[12] *See id.* at 188–93. Because such conditions are

---

[9] *See generally* CRS Study at 11, 109–110; S. Rep. No. 47, 96th Cong., 1st Sess. 13–25 (1979) (Panama Canal Treaty); S. Rep. No. 29, 97th Cong., 1st Sess. 45 (1981) (SALT II Treaty).

[10] *See generally* CRS Study at 109–110; Henkin at 134 & n.23 (1972); S. Rep. No. 47, 96th Cong., 1st Sess. 24–25 (Panama Canal Treaty); S. Rep. No. 29, 97th Cong., 1st Sess. 44–45 (SALT II Treaty).

[11] Such "declarations," which do not purport to interpret the treaty but only to express a "sense of the Senate" with respect to related issues, may or may not be included by the President in the instrument of ratification submitted to the other parties. *See, e.g.,* CRS Study at 110 & n.10 (discussing 1976 Treaty of Friendship and Cooperation with Spain).

[12] Treaties usually require international action such as the exchange or deposit of instruments of ratification in order to establish international obligations. *See* 14 Whiteman, *supra,* at 62; Vienna Convention on the Law of Treaties, art. 2. In general, conditions that alter the obligations of a party under the treaty must be presented with the treaty documents. *See* 14 M. Whiteman, *supra,* at 188–193. "Understandings" or "declarations," which only clarify the meaning of a treaty provision or describe a policy, rather than alter the meaning of the treaty, are generally communicated to the other parties, but are not necessarily included with the official treaty documents. *Id.* In 1976, the President communicated five Senate "declarations" relating to the Treaty of Friendship and Cooperation with Spain of 1976, 27 U.S.T. 3005, T.I.A.S. No. 8360, separately from the ratification, explaining that he viewed the declarations as appropriate "statements of hope and expressions of opinion" and as "statements of domestic United States processes." [1976] *Digest of U.S. Practice in International Law* 214–17 (described in *Restatement (Revised)* § 314, n.1). The Senate Foreign Relations

Continued

32

considered to be part of the United States's position in ratifying the treaty, they are generally binding on the President, both internationally and domestically, in his subsequent interpretation of the treaty.[13] *See generally United States* v. *Schooner Peggy*, 5 U.S. (1 Cranch) 103, 107 (1801); *Haver* v. *Yaker*, 76 U.S. (9 Wall.) 32, 35 (1869); *Hidalgo County Water Control and Improvement District No. 7* v. *Hedrick*, 226 F.2d 1, 8 (5th Cir. 1955); *Restatement (Revised)* § 323.

## B. Statements in the Ratification Record

The more difficult question is what relevance, if any, the President must give to less formal, contemporaneous indications of the Senate's understanding of the treaty, *i.e.*, statements in committee reports, hearings, and debates which may reflect an understanding of certain treaty provisions by some Senators, but which were not embodied in any formal understanding or condition approved by the entire Senate.[14] With the not insubstantial exception of representations made or confirmed by the Executive Branch (discussed below), we believe such statements have only limited probative value and therefore are entitled to little weight in subsequent interpretations of the treaty.[15]

---

[12] (. . . continued)

Committee has criticized this practice in the past, and has recommended a three-tiered categorization of conditions: (1) those that do not directly involve formal notice to or agreement by the other parties; (2) those that would be formally communicated to the other parties as official statements of the position of the United States in ratifying the treaty, but that do not require their agreement; and (3) those that would require the explicit agreement of the other parties for the treaty to come into force. S. Exec. Rep. 96–14, 96th Cong., 1st Sess. 18, 28 (1979).

[13] This presumes, of course, that the condition is within the Senate's authority to impose as part of its treaty-making authority. The Senate's authority to impose conditions is not unlimited merely because it may withhold its consent. The general principle that Congress cannot attach unconstitutional conditions to a legislative benefit or program merely because it has authority to withhold the benefit or power entirely applies equally to the Senate's advice and consent authority. *See generally Wong Wing* v. *United States*, 163 U.S. 228, 237 (1896); *Myers* v. *United States*, 272 U.S. 52, 126 (1926). The Senate may not, for example, use its advice and consent power to impose conditions that affect separate, wholly domestic, statutory schemes. *See Power Authority* v. *Federal Power Comm'n*, 247 F.2d 538 (D.C. Cir.), *vacated as moot sub nom. American Pub. Power Association* v. *Power Authority*, 355 U.S. 64 (1957). As we have advised before, we do not believe the Senate may impose conditions that interfere with the President's responsibility to execute the laws. *See* "Constitutionality of Proposed Conditions to Senate Consent to the Interim Convention on Conservation of North Pacific Fur Seals," 10 Op. O.L.C. 12 (1986).

[14] It is clear that *post hoc* expressions of legislative intent, after the treaty has been duly ratified, cannot change the legal effect of an international agreement to which the Senate has given its approval. *See Fourteen Diamond Rings* v. *United States*, 183 U.S. 176, 179–180 (1901) (resolution adopted by Congress after the Senate had consented to ratification of a treaty is "absolutely without legal significance"). Congress may, of course, in effect validate an Executive Branch interpretation of a treaty by passing legislation consistent with that view. *See generally Foster & Elam* v. *Neilson*, 27 U.S. (2 Pet.) 253, 309 (1830).

[15] We note that while a few courts have alluded to the record the Senate creates in advising and consenting to the ratification of treaties, none has advanced a comprehensive theory of what weight should be given to particular portions of the ratification record and none, to our knowledge, has specifically relied on representations in the Senate record to support a particular construction of a treaty. *See Hidalgo County Water Control & Improvement District* v. *Hedrick*, 226 F.2d at 8 (refusing to consider evidence from Senate hearings, committee discussions, and debates because the meaning of the treaty was otherwise clear); *Coplin* v. *United States*, 6 Ct. Cl. 115, 144 (1984), *rev'd on other grounds*, 761 F.2d 688 (Fed. Cir. 1985), *aff'd sub nom. O'Connor* v. *United States*, 479 U.S. 27 (1986) (reviewing Senate "legislative history" of the Panama Canal Treaty but finding that it was entitled to little weight).

33

First, it must be observed that a treaty is fundamentally a "contract between or among sovereign nations,"[16] and the primary responsibility — whether of the executive or the courts — is "to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Air France* v. *Saks*, 470 U.S. 392, 399 (1985). *See generally Foster & Elam* v. *Neilson*, 27 U.S. (2 Pet.) 253, 314 (1830) ("A treaty is in its nature a contract between two nations, not a legislative act."). International agreements, like "other contracts . . . are to be read in the light of the conditions and circumstances existing at the time they were entered into, with a view to effecting the objects and purposes of the States thereby contracting." *Rocca* v. *Thompson*, 223 U.S. 317, 331–332 (1912). Necessarily, the best evidence of the intent of the parties is the language and structure of the treaty and, secondarily, direct evidence of the understanding reached by the parties, as reflected in the negotiating record and subsequent administrative construction,[17] rather than unilateral, post-negotiation statements made during the Senate ratification debates.

Moreover, the constitutional role of the Senate is limited to approval or disapproval of the treaty, much as the President's constitutional role in enacting domestic legislation is limited to his veto power. The Senate may, if it chooses, amend or interpret the treaty by attaching explicit conditions to its consent, which are then transmitted to, and either accepted or rejected by, the other parties. Absent such conditions, the Senate does not participate in setting the terms of the agreement between the parties, and therefore statements made by Senators, whether individually in hearings and debates or collectively in committee reports, should be accorded little weight unless confirmed by the Executive. We note that even in the case of domestic legislation, where Congress — rather than the President and other foreign governments — directly shapes the operative language, "[r]eliance on legislative history in divining the intent of Congress is . . . a step to be taken cautiously." *Piper* v. *Chris-Craft Industries, Inc.*, 430 U.S. 1, 26 (1977).[18]

---

[16] *TWA, Inc.* v. *Franklin Mint Corp.*, 466 U.S. 243, 262 (1984) (Stevens, J., dissenting); *Washington* v. *Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979).

[17] *See generally O'Connor* v. *United States*, 479 U.S. 27, 31–33 (1986); *Air France* v *Saks*, 470 U.S. at 396; *Maximov* v. *United States*, 373 U.S. 49, 54 (1963); *Kolovrat* v *Oregon*, 366 U.S. at 194; *Factor* v. *Laubenheimer*, 290 U.S. at 294; *Jones* v. *Meehan*, 175 U.S. at 4, 23.

[18] For example, "ordinarily even the contemporaneous remarks of a single legislator . . . are not controlling in analyzing legislative history." *Consumer Products Safety Comm'n* v. *GTE Sylvania*, 447 U.S. 102, 118 (1980). As the Court stated in *Weinberger* v. *Rossi*, 456 U.S. 25 (1982):

> [O]ne isolated remark by a single Senator, ambiguous in meaning when examined in context, is insufficient to establish the kind of affirmative congressional expression to evidence an intent to abrogate provisions in 13 international agreements.

*Id*. at 35. Similarly, statements made during legislative hearings provide only limited guidance as to the intent or understanding of the Senate as a whole. *See, e.g.*, *McCaughn* v. *Hershey Chocolate Co.*, 283 U.S. 488, 493–494 (1931); *Austasia Intermodel Lines, Ltd.* v. *CFMC*, 580 F.2d 642, 645 (D C. Cir. 1978). Committee reports provide important evidence of the legislative intent, but are at best "only aids" in interpreting ambiguous statutory language. *See Abourezk* v. *Reagan*, 785 F 2d 1043 (D.C. Cir. 1986); *General Motors Corp.* v. *Ruckelshaus*, 742 F.2d 1561 (D.C. Cir. 1984), *cert. denied*, 471 U.S 1074 (1985); *NLRB* v. *Res-Care, Inc.*, 705 F.2d 1461 (7th Cir. 1983); *Mills* v. *United States*, 713 F.2d 1249 (7th Cir. 1983), *cert. denied*, 464 U.S. 1069 (1984).

Indeed, profound foreign policy implications would be raised if the United States were to supplement or alter treaty obligations to foreign governments based on statements made by members of the Senate during its consideration of the treaty that were not communicated to those governments in the form of express conditions. "[F]oreign governments dealing with us must rely upon the official instruments of ratification as an expression of the full intent of the government of the United States, precisely as we expect from foreign governments." *Coplin* v. *United States*, 6 Ct. Cl. at 145. In *New York Indians* v. *United States*, 170 U.S. 1, 22–23 (1898), for example, the Supreme Court refused to give effect, vis-a-vis the Indians, to a proviso adopted by the Senate but not included in the treaty documents subsequently presented to the Indians for their acceptance:

> There is something . . . which shocks the conscience in the idea that a treaty can be put forth as embodying the terms of an arrangement with a foreign power or an Indian tribe, a material provision of which is unknown to one of the contracting parties, and is kept in the background to be used by the other only when the exigencies of a particular case may demand it. The proviso never appears to have been called to the attention of the tribes, who would naturally assume that the treaty, embodied in the Presidential proclamation contained all the terms of the arrangement.

We can well imagine that the United States would be deeply disturbed if the Soviet Union resolved ambiguities in a treaty by reference to deliberations in a Soviet legislative body charged with consenting to its ratification.[19] If individual Senators believe that portions of a treaty are ambiguous, they may resolve that ambiguity in a manner consistent with the mutual process through which treaties are negotiated: either by requesting the Executive to state more clearly the meaning of the agreement it has reached with the foreign country, or by making explicit the Senate's understanding of the provision through a formal reservation or understanding attached to its resolution of approval. Thus, while statements made by individual senators or even in committee reports may at times provide a gloss on other, more direct sources of evidence of a treaty's meaning, we believe they are entitled to little weight in and of themselves.[20]

On the other hand, statements made to the Senate by representatives of the Executive Branch as to the meaning of a treaty should have considerably more

[19] Consistent with this view, when questions arose concerning the Panamanian interpretation of certain key provisions of the Panama Treaties, the State Department took the position that the United States would rely on the final instruments of ratification as expressing the full intent of the parties. *See* CRS Study at 128 & n.62.

[20] The latest tentative draft of the *Restatement* takes the position that "indication in the record that the Senate ascribed a particular meaning to the treaty is relevant to the interpretation of the treaty by a United States court in much the same way that the legislative history of a statute is relevant to its interpretation." *See Restatement (Revised)* § 314, comment d (Tentative Final Draft). As the discussion makes clear, we believe the *Restatement* position exaggerates somewhat the general evidentiary significance of the Senate ratification record in interpreting ambiguous provisions of an international treaty.

weight in subsequent interpretations of ambiguous terms of the treaty. Such statements do not present as substantial a threat to the reliance interests of foreign governments, because the Executive Branch negotiated the treaty and is therefore in a position to represent authoritatively the meaning of the agreement that emerged from the negotiating process. Moreover, given that the Senate's constitutional role is limited to approving a treaty already negotiated by the Executive Branch and that much of the extra-textual evidence of a treaty's meaning remains in the control of the Executive Branch, we believe the Senate itself has a substantial reliance interest in statements made by the Executive Branch officials seeking that approval.

Accordingly, consistent with the President's role as the nation's exclusive negotiator of treaties with foreign governments, we believe that statements made to the Senate by the Executive Branch during the ratification debates are relevant in much the same way that contemporaneous statements by congressional draftsmen or sponsors of domestic legislation are relevant to any subsequent interpretation of the statute. *See, e.g., FEA* v. *Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976) (statement by one of legislation's sponsors "deserves to be accorded substantial weight in interpreting the statute"); *National Woodwork Manufacturers Ass'n* v. *NLRB*, 386 U.S. 612, 640 (1967); *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U.S. 384, 394–395 (1951). We note that because of the primary role played by the Executive Branch in the negotiation of treaties and the implementation of foreign policy, courts generally accord substantial deference — albeit not conclusive effect — to interpretations advanced by the Executive Branch. "While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." *Kolovrat* v. *Oregon*, 366 U.S. at 194; *see also Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U.S. 176, 185 (1982); *Collins* v. *Weinberger*, 707 F.2d 1518, 1522 (D.C. Cir. 1983) ("Courts should defer to such executive actions [interpreting a treaty] provided they are not inconsistent with or outside the scope of the treaty."); *Restatement (Revised)* § 326, comment b. Although the courts often rely on interpretative statements made by the Executive Branch prepared well after negotiation and ratification of the treaty,[21] they find particularly persuasive a consistent pattern of Executive Branch interpretation, reflected in the application of the treaty by the Executive and the course of conduct of the parties in implementing the agreement. *See, e.g., O'Connor* v. *United States*, 479 U.S. at 32–33. Much as contemporaneous administrative construction of domestic statutes by agencies charged with their implementation is generally accorded considerable deference by the courts, particularly when those agencies have made explicit representations to Congress during consideration of the

---

[21] On occasion, the State Department makes specific suggestions to the court about the interpretation of an agreement. *See, e.g., Coplin* v. *United States*, 761 F.2d 688, 691 (Fed. Cir. 1985), *aff'd sub nom. O'Connor* v. *United States*, 479 U.S 27 (1986). The courts in fact often invite the United States to file amicus briefs giving the views of the Executive Branch in cases to which the United States is not a party. *See, e.g., Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U.S. 176 (1982); *Zschernig* v. *Miller*, 389 U.S. 429 (1968); *Kolovrat* v. *Oregon*, 366 U.S. 187 (1961).

legislation,[22] statements made to the Senate by members of the Executive Branch about the scope and meaning of a treaty would be relevant evidence of the Executive Branch's view, and therefore would be accorded deference by a court in assessing the domestic effect of the treaty.

The weight to be given to an interpretative statement made by an Executive Branch official to the Senate during the ratification process will likely depend upon such factors as the formality of the statement, the identity and position of the Executive Branch official making the statement, the level of attention and interest focused on the meaning of the relevant treaty provision, and the consistency with which members of the Executive Branch adhered at the time to the view of the treaty provision reflected in the statement.[23] All of these factors affect the degree to which the Senate could reasonably have relied upon the statement and, in turn, the weight that courts will attach to it. At one extreme, a single statement made by a middle-level Executive Branch official in response to a question at a hearing would not be regarded as definitive. Rather, in interpreting the domestic effect of a treaty, the courts would likely accord such a statement in the ratification record a degree of significance subordinate to more direct evidence of the mutual intent of the parties, such as the language and context of the treaty, diplomatic exchanges between the President and the other treaty parties, the negotiating record, and the practical construction of the provision reflected in the parties' course of dealings under the treaty. Moreover, courts often give substantial weight to the Executive Branch's current interpretation of the treaty, in recognition of the President's unique role in shaping foreign policy and communicating with foreign governments,[24] and, accordingly, would be unlikely to bind future chief executives on the basis of an isolated remark of an Executive Branch official in a previous administration. In general, therefore, less formal statements made by the Executive Branch before the Senate (such as the one described in the preceding hypothetical) will be but one source of relevant evidence to be considered in interpreting an ambiguous treaty provision.

In contrast, in a case in which the statements by the Executive Branch amount to a formal representation by the President concerning the meaning of a particular treaty provision, the ratification record may be conclusive. If, for example, the ratification record unequivocally shows that the President presented the treaty to the Senate based on specific, official representations regarding the meaning of an ambiguous provision, that the Senate regarded that

---

[22] *See, e.g., United States* v. *Vogel Fertilizer Co.,* 455 U.S. 16, 30 (1982) (court necessarily attaches great weight to agency representations to Congress when the administrators participated in drafting the statute and directly made known their views to Congress); *Dawson Chemical Co.* v. *Rohm & Haas Co.,* 448 U.S. 176, 202–212 (1980) (statements by administration witnesses during hearings on patent infringement legislation strongly reinforce the court's conclusion that Congress intended to immunize respondent's behavior from patent misuse charges). In general, courts give "great weight" in construing domestic statutes to contemporaneous constructions by the executive branch. *See generally Udall* v. *Tallman,* 380 U.S. 1, 16 (1965); *Red Lion Broadcasting Co.* v. *FCC,* 395 U.S. 367, 381 (1969).

[23] Similarly, the weight of statements by senators confirmed by the executive will depend, *inter alia,* on the formality of the confirmation and the identity and position of the person confirming the statement.

[24] *See, e.g., Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U.S. at 184 n.10.

understanding as important to its consent, and that the Senate relied on the representations made by the Executive Branch in approving the treaty (and thus in refraining from attaching a formal reservation setting forth the understanding), we believe the President would, in effect, be estopped from taking a contrary position in his subsequent interpretation of the treaty, just as he would be bound by a formal reservation or understanding passed by the Senate to the same effect. *See generally United States* v. *Vogel Fertilizer Co.*, 455 U.S. at 31 (refusing to uphold current Treasury Department interpretation in light of evidence that the Treasury Department proposed and presented the legislation to Congress on a different understanding). Obviously, a President could not negotiate a treaty with other nations on the basis of one understanding of its import, submit the treaty to the Senate on a wholly different understanding, and then, in implementing the treaty, rely solely on the understanding he had reached with the other parties. Similarly, he could not reach a secret agreement with the other party that substantially modifies the obligations and authorities created by the text of the treaty submitted to the Senate, and then seek to use the secret agreement as a basis for actions inconsistent with the text of the treaty. Such results would essentially eviscerate the Senate's constitutional advice and consent role, because it would deprive the Senate of a fair opportunity to determine whether, or with what conditions, the treaty should become the "supreme Law of the Land." Accordingly, in such extreme cases, we have little doubt that, as a matter of domestic law, the courts would construe the treaty as presented to and accepted by the Senate, even if as a matter of international law the treaty might have a different meaning.[25]

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[25] Although courts generally seek to construe treaties consistent with their international import, on occasion courts have adopted constructions of particular treaties that conflict with the President's view of the international obligations created by the treaty. *See, e.g., Maiorano* v. *Baltimore & Ohio R.R.*, 213 U.S. 268 (1909) (interpreting an 1871 treaty with Italy giving aliens access to courts of justice). Moreover, Congress can enact domestic legislation that is inconsistent with existing treaty obligations, and thus has the effect of tying the President's hands domestically, while leaving the international obligations intact. *See generally Menominee Tribe of Indians* v. *United States*, 391 U.S. 404, 412–413 (1968); *Moser* v. *United States*, 341 U.S. 41, 45 (1951); *Torres* v. *INS*, 602 F.2d 190, 195 (7th Cir. 1979). It would not be unprecedented, therefore, for a court to construe a treaty more narrowly — or more broadly — as a matter of domestic law than the President construes the treaty as a matter of international law. As Professor Henkin has observed, "[i]t could happen . . . that Congress and the courts would in effect apply treaty provisions different from those that bind the United States internationally — another cost of the separation of powers." Henkin at 167.